IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES WILLIAMS,

Plaintiff,

v.

R. IRWIN, et al.,

Defendants.

CIVIL ACTION
NO. 22-4140

# OPINION

**Slomsky, J.** **September 28, 2026**

## TABLE OF CONTENTS

**I. INTRODUCTION** ..... 2

**II. BACKGROUND** ..... 2

**III. STANDARD OF REVIEW** ..... 7

A. Magistrate Report and Recommendation ..... 7

B. Merits Review ..... 8

C. Brady Violation ..... 10

**IV. ANALYSIS** ..... 11

A. Petitioner's Brady Claim is Without Merit ..... 11

**V. CONCLUSION** ..... 15

## I. INTRODUCTION

Before the Court is an Amended Petition for a Writ of Habeas Corpus (the "Amended Petition") filed pursuant to 28 U.S.C. § 2254 by James Williams ("Petitioner"). (Doc. No. 18.) On June 10, 2026, United States Magistrate Judge Craig M. Straw issued a Report and Recommendation ("R&R"), recommending that the Amended Petition be denied and that a certificate of appealability not be issued. (Doc. No. 54.) On August 24, 2026, Petitioner filed an objection to the R&R. (Doc. No. 59.)

For the reasons set forth below, the Court will approve and adopt the R&R (Doc. No. 54) and deny the Amended Petition. (Doc. No. 18).[1]

## II. BACKGROUND

In November 2012, following a jury trial in the Philadelphia Court of Common Pleas, Petitioner was convicted of first-degree murder and violating the Uniform Firearms Act ("UFA"). (Doc. No. 18 at 1.) The victim of the shooting by Petitioner was Nathaniel Nazario ("Nazario"). (Id. at 1.) As a result, Petitioner was sentenced to mandatory life imprisonment without parole. (Id. at 9.) The facts underlying the charges are summarized in the R&R as follows:

> On August 26, 2009, the Commonwealth charged Williams with first-degree murder and violating the UFA. His first jury trial, before the Honorable Steven R. Geroff, in March 2012, resulted in a hung jury. Williams was retried before Judge Carpenter in November 2012. During two days of deliberation, the jury submitted two questions: one regarding the definition of conspiracy, and another requesting to see Colon's second statement to police.[2] The jury found Williams guilty of

---

[1] For purposes of this Opinion, the Court has considered the Amended Petition for a Writ of Habeas Corpus (Doc. No. 18), the Response in Opposition to the Petition (Doc. No. 45), the Report and Recommendation (Doc. No. 54), the Objections to the Report and Recommendation (Doc. No. 59), the Response to Objections to the Report and Recommendation (Doc. No. 64), and the relevant state court record.

[2] Jennifer Colon ("Colon") was a witness to the shooting of Nazario. (Doc. No. 18 at 2.)

first-degree murder and violating the UFA, but acquitted him of conspiracy. Judge Carpenter sentenced Williams to a mandatory term of life imprisonment on the murder charge, and did not impose any additional penalty on the gun possession charge.

On direct appeal, Williams challenged the weight and sufficiency of the evidence supporting his murder conviction, the propriety of the prosecution's comments during opening and closing argument, and alleged improper witness bolstering and incomplete jury instructions. The Superior Court affirmed. Pa. Super. Direct Op. at *1, (reargument denied Feb. 26, 2015), and the Pennsylvania Supreme Court denied allowance of appeal.

On August 29, 2012, while Williams was awaiting retrial, Darnell Outlaw ("Outlaw") and Janine Dunn ("Dunn") recruited Markeem Wilson ("Wilson") to rob a McDonald's restaurant in Northeast Philadelphia. Second Proffer Interview of Darnell Outlaw, Nov. 22, 2013 (attached to Response, Doc. 45-1 at 3). Outlaw and Dunn were indicted on federal charges pertaining to the robbery in October 2012, while Wilson – the gunman in the McDonald's robbery, then unidentified – remained at large. United States v. Outlaw, et al., No. 12-Cr-587, Doc. 1. (E.D. Pa.). Outlaw was arrested on November 9, 2012, the same day the jury returned its verdict against Williams. Id. In March 2014, Outlaw and Dunn pleaded guilty and were sentenced, respectively, to 3.5 years' incarceration followed by 3 years of supervised release, and to time served followed by 4 years of supervised release. Id.

Prior to Outlaw's plea, the FBI conducted multiple proffer interviews with him. Though Outlaw had initially claimed that he did not know the identity of the gunman who robbed the McDonald's with him, during the November 22, 2013 interview, he identified Wilson, who he had been close friends with for approximately 10 years, as the gunman. Doc. 45-1 at 3. He explained that he and Wilson were both drug dealers and that he sold marijuana to Wilson. Id. Outlaw claimed that he had been reluctant to identify Wilson, in part because he feared retaliation against Outlaw's wife and their two children if he cooperated. Id. He explained that he had reason to fear Wilson because Wilson had murdered Nazario. Id. Outlaw claimed that Wilson had confessed to him that one month prior to Nazario's murder, three men from outside their South Philadelphia neighborhood had burglarized Wilson's residence and put guns to the heads of Wilson's mother and relatives. Id. Wilson learned that Nazario had orchestrated the burglary, and the following month, Wilson confronted Nazario in an alley outside Wilson's home. Id. at 3-4. Williams was also present during the encounter. Id. at 4. When Nazario turned to retrieve something from his car, Wilson shot Nazario in the back, killing him. Id. Outlaw claimed to have spoken with Williams, who relayed the same story. Id.

On February 7, 2014, the Philadelphia Police Department ("PPD") interviewed Outlaw in connection with the Nazario murder. February 7, 2014, Investigation Interview Record: Darnell Outlaw (attached to Response, Doc. 45-2). Outlaw told police that Wilson, a friend of his, admitted to killing Nazario in retaliation

for a home invasion. Id. at 3. He explained that Nazario had hired individuals from outside the neighborhood to commit the home invasion, and they took money, drugs, and guns from the home. Id. at 3, 5. Outlaw also claimed that during the fatal encounter, Nazario did not want to fight, and turned to go to his car, at which point Wilson shot him. Id. at 3.

Outlaw shared that this conversation with Wilson occurred during Williams' trial, although he had heard around the time of the murder that Wilson was the shooter. Doc. 45-2 at 4. Wilson also told Outlaw that Williams and Little were present during the encounter. Id. at 45. Outlaw told police that he spoke with Williams about the shooting, and Williams confirmed Wilson's account. Id. at 6. Outlaw pled guilty in March 2014, Doc. 30, 12-Cr-587, and Wilson was indicted for robbery two months after that. Doc. 1, United States v. Wilson, 14-Cr-252 (E.D. Pa.)

On December 3, 2015, Williams filed a pro se petition for post-conviction relief under Pennsylvania's Post Conviction Relief Act ("PCRA"). Commonwealth v. Williams, CP-51-CR0007513-2010, Motion for Post Conviction Collateral Relief (Phila. Cnty. C.C.P. Dec. 3, 2015). Williams utilized a standard form and indicated that he was raising, in addition to several other claims, an after-discovered evidence claim. Id. As supporting detail for that claim, he referred to Outlaw's FBI interview, explaining that "it had been rumored" that the "actual perpetrator" of the Nazario murder was in federal custody, and Outlaw, a friend of Wilson's "exposed" to the FBI that Wilson was the actual killer of Nazario. Id. ¶ 5(b). Williams noted that he was retaining a private investigator to obtain Outlaw's FBI statement. Id.

On March 16, 2016, Williams filed a motion to amend his PCRA after-discovered evidence claim. Commonwealth v. Williams, CP-51-CR-0007513-2010, Motion Requesting to Amend After Trial/Newly Discovered Evidence to Defendant's Pending PCRA (Phila. Cnty. C.C.P. Mar. 16, 2016). In that filing, Williams explained that his private investigator had obtained Outlaw's FBI interview, and attached the interview and an accompanying letter from his investigator explaining the investigator had obtained the interview from the Philadelphia District Attorney's Office on February 25, 2016. In a subsequent filing, Williams claimed that he first learned "that there was exculpatory documents made by a federal witness" in May 2014, and that these documents proved that he "did not commit or participate in this criminal act." Commonwealth v. Williams, CP-51-CR-0007513-2010, Motion for Leave to Supplement/Add Issue to PCRA, ¶ 3 (Phila. Cnty. C.C.P. May 5, 2016).

On February 7, 2017, Williams filed with the PCRA court, an unsworn affidavit from Outlaw, signed and dated December 23, 2016, which states "Markeem Wilson is responsible for the murder of the victim [Nazario]. He told me this from his own mouth because [Nazario] had his house robbed. The person locked up for this matter (James Williams) didn't do it or have anything to do with the murder of [Nazario]." Commonwealth v. Williams, CP-51-CR-00075132010, Un-sworn Affidavit (Phila. Cnty. C.C.P. Feb. 7, 2017).

Counsel was subsequently appointed, and Williams filed an amended PCRA petition and memorandum of law, which raised a singular claim of after-discovered evidence based on Outlaw's FBI statement, and requested an evidentiary hearing. Criminal Docket (entries dated Sept. 1, 2016 & Mar. 10, 2017); Doc. 18-1 at 405-08 (amended PCRA petition).

The Commonwealth moved to dismiss Williams' PCRA petition, arguing the fact that Wilson was the actual perpetrator was not "after-discovered" and that Outlaw's statements were inadmissible hearsay. Doc. 18-1 at 416-21.7 The PCRA court issued a dismissal notice, which included reasoning closely mirroring the Commonwealth's arguments. Commonwealth v. Williams, CP51-CR-0007513-2010, Rule 907 Notice (Phila. Cnty. C.C.P. Mar. 16, 2018). Williams responded pro se, appealed prematurely to the Superior Court, and moved to represent himself in PCRA proceedings. Criminal Docket (entries dated Apr. 17 through June 5, 2018). The Superior Court quashed the premature appeal, and Judge Carpenter granted Williams' motion to represent himself and dismissed the petition without a hearing, incorporating her previous reasoning from the dismissal notice. Id. (entries dated June 11 & Dec. 17, 2018); Doc 18-1 at 429-34 (Judge Carpenter Opinion). In her opinion in support of dismissal, Judge Carpenter noted that she had not made any findings on the accuracy of Outlaw's statement. Doc. 18-1 at 433 n.18. Williams did not appeal the PCRA court's dismissal.

On October 11, 2022, Williams filed a pro se habeas petition asserting three claims, including a claim of actual innocence based on Outlaw's statements to the FBI and to Williams' private investigator, and Outlaw's unsworn affidavit. Doc. 1 ¶ 12 (GROUND THREE). The District Attorney subsequently moved for the appointment of counsel, citing the discovery of Outlaw's February 2014 PPD interview in the PPD homicide file, which could support a potential Brady claim. Doc. 13 at 3-4. The Court granted the motion, and appointed current counsel, Jonathan Feinberg, Esq., to represent Williams. Doc. 16. Thereafter, Williams filed a counseled amended habeas petition raising a Brady claim based on the Commonwealth's failure to disclose Outlaw's PPD interview. Doc. 18 at 15. In the amended petition, Williams noted that he had communicated with the District Attorney and requested that he affirmatively waive any exhaustion defense. Id. at 17. Following a telephone conference with the parties, at which counsel for Williams made an oral motion to waive exhaustion, I ordered bifurcated briefing from the District Attorney: first on exhaustion, and then on the petition as a whole. Docs. 24, 26, 27. The District Attorney filed a response affirmatively waiving exhaustion and all other procedural bars, and agreed to an evidentiary hearing. Doc. 29.

On August 8, 2024, the Court held an evidentiary hearing at which Outlaw testified about Wilson's alleged confession. N.T. 8/8/24. Outlaw acknowledged that he had reviewed his previous FBI and PPD statements in preparation for the hearing. Id. at 18-19, 21. He testified that he grew up with both Williams and Wilson and considers Williams a friend. Id. at 14. He speaks to Williams "frequently" – every week or other week, at Williams' initiation. Id. at 25. By

contrast, until a recent encounter on the street a few months before the hearing, he had not spoken to Wilson since 2012, and has no relationship with him. Id. at 25, 34. When asked what he and Wilson spoke about during their recent encounter, Outlaw was initially reluctant to answer, stating "[t]hat doesn't have anything to do with why I'm here, so there's no point in even talking about that." Id. at 33. However, upon additional questioning, he later admitted that it related to the McDonald's robbery. Id. at 35.

Outlaw testified that he spoke to Wilson "probably once or twice" about the Nazario murder, and those conversation(s) occurred prior to Williams' first trial and at Wilson's home. N.T. 8/8/24 at 16, 28. Outlaw knew that Wilson was the shooter, and asked Wilson whether he intended to "step up" and tell authorities that Williams was innocent, to which Wilson responded halfheartedly that he would. Id. at 16. According to Outlaw, Wilson told him that the shooting was in retaliation for an earlier incident in which Nazario had individuals from North Philadelphia rob Wilson's house and threaten his family with guns. Id. at 16-17, 29. Outlaw had heard about the home invasion around the time when it happened from "neighborhood talk" and theorized that Wilson's family would have reported it to the police. Id. at 27. Wilson told Outlaw that he and Nazario met up to talk or fight following the home invasion. Id. at 17-18. When Nazario left to return to his car, Wilson shot him in the back. Id. at 18, 29. Outlaw speculated that Wilson confessed to him because it was "eating him up." Id. at 28.

On cross-examination, Outlaw testified that he had discussed the murder "a few" times with Williams, but never in the presence of both Williams and Wilson. N.T. 8/8/24 at 29-30. He explained that he did not report Wilson's confession earlier because he believed Williams still had a chance of acquittal after the first trial ended in a hung jury, and, given that Williams was already being prosecuted, he felt there was little he could do at the time. Id. at 32. Plus, Outlaw was incarcerated on the McDonald's robbery and the Nazario murder did not have anything to do with his situation. Id. However, when it became clear that Williams was not going to "come home," Outlaw spoke up to help Williams out, because he did not think remaining silent was the right thing to do. Id. at 32, 40. Outlaw stated that he did not share Wilson's confession with others in the community, including his own family, because he believed it was unnecessary, as it was widely known that Wilson was responsible. Id. at 35. Outlaw also claimed that he received no benefit in the robbery case for his statements regarding the Nazario murder, and that Williams had not promised him anything in exchange for those statements or for his testimony at the hearing. Id. at 27, 34.

Following the evidentiary hearing, the Court denied Williams' motion to waive exhaustion without prejudice, deferring consideration of that issue for the Report and Recommendation. Doc. 38. The District Attorney filed a response to the amended habeas petition, in which it opposed relief on the merits, but noted that because it viewed the petition as a "close case," it would affirmatively waive any procedural bars that would otherwise preclude consideration of the merits of Williams' claim. Doc. 45 at 22-23. Williams filed a counseled reply, and the matter is fully briefed. Doc. 52.

(Doc. No. 54 at 4-12.)

In the Amended Petition, Petitioner raises the following grounds for relief:

(1) The prosecution withheld Darnell Outlaw's ("Outlaw") statement to the Philadelphia Police Department ("PPD") obtained while Williams' direct appeal was pending in violation of Brady; and

(2) The state court's ruling denying Williams' PCRA petition based on Outlaw's statement to the FBI does not bar the Court's ability to grant habeas relief as it relates to Outlaw's statement to the PPD.

(See Doc. No. 18.)

In the R&R, Judge Wells recommended that the Amended Petition be denied. (Doc. No. 54 at 1.) On August 24, 2026, Petitioner filed Objections to the R&R. (Doc. No. 59.) The Objections consist of the following:

1. There is a reasonable probability that Williams would have prevailed on an after-discovered evidence claim because the suppression of Outlaw's statement was material under Brady; and

2. The R&R is not entitled to deference as it failed to consider the weakness of the Commonwealth's trial evidence and Outlaw's credibility.

(Doc. 59 at 22-29.)

For the reasons discussed below, the Court will approve and adopt the R&R (Doc. No. 54) and will deny the Petition (Doc. No. 18.)

## III. STANDARD OF REVIEW

### A. Magistrate Judge's Report and Recommendation

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district court judge is permitted to designate a magistrate judge to make proposed findings and recommendations on

petitions for post-conviction relief. See 28 U.S.C. § 636(b)(1)(B); E.D. Pa. Civ. R. 72.1. Any party may file objections in response to the magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1)(C). Whether an objection is made or not, a district judge "may accept, reject, or modify, in whole or in part, the findings of recommendations made by the magistrate judge with further instructions." Id. "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court." Henderson v. Carlson, 812 F.2d 784, 878 (3d Cir. 1987).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(b) governs a petitioner's objections to a magistrate judge's report and recommendation. See E.D. Pa. Civ. R. 72.1. Under that rule, a petitioner must "specifically identify the portions of the proposed findings, recommendations[,] or report to which objection s made and the basis for such objections." Savior v. Superintendent of Huntingdon SCI, No. 11-5639, 2021 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012). Upon review, "[a district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). De novo review is non-deferential and generally permits the district court to conduct an "independent review" of the entire matter. Salve Regina Coll. v. Russell, 499 U.S. 255, 238 (1991). "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper." Owens v. Beard, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)).

B. Merits Review

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review will only be granted if: (1) the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the court's decision "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(1)–(2). Determinations of factual issues made by a state court "are presumed to be correct and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence." Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)); see also Miller-El v. Cockrell, 537 U.S. 322, 340–41 (2003). The Supreme Court has defined clearly established law as "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyear v. Andrade, 538 U.S. 63, 71–72 (2003).

A state court ruling is "contrary to" clearly established federal law for the purposes of § 2254(d)(1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Williams v. Taylor, 529 U.S. 362, 405–06 (2000). The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Id. at 413.

A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court decisions, but "unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407–08. The

state court's ruling must be "objectively unreasonable, not merely wrong." Virginia v. LeBlanc, 582 U.S. 91, 93 (2017) (internal citation omitted). As the Third Circuit has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless the court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411). Deference is given to state court rulings, and the application of the "contrary to" and "unreasonable application clauses" has proven to be "difficult to meet." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

This burden is substantial. And under the AEDPA, review of state court legal and factual determinations is highly deferential. See Palmer v. Hendricks, 592 U.S. 386, 392 (3d Cir. 2010) ("AEDPA requires federal courts collaterally reviewing state proceedings to afford considerable deference to state courts' legal and factual determinations.") If a state court did not adjudicate a claim on the merits, however, the deferential standard of the AEDPA does not apply. Id. Rather, in such cases, "the federal habeas corpus court must conduct a de novo review over pure legal questions and mixed questions of law and fact . . ." Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

C. Brady Violation

In the landmark case Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that "[t]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. To establish a Brady violation, a petitioner must demonstrate: (i) evidence was suppressed by the state, either willfully or inadvertently; (ii) the evidence is favorable to the accused, either because it is exculpatory or

impeaching; and (iii) the evidence was material to the outcome of the case. Strickler v. Greene, 527 U.S. 263, 281-82 (1999). Evidence is Brady material when it places the "whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995). Further, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," then the evidence must have been disclosed. Strickler, 527 U.S. at 280 (citation omitted). In order for evidence to be material, it is not necessary that the evidence be established by a preponderance that its disclosure would have resulted in an acquittal. Kyles, 514 U.S. at 434. Rather, in determining materiality, the assessment of the omitted evidence's impact must take account of the cumulative effect of the suppressed evidence in light of all the other evidence, not merely the value of the suppressed evidence standing alone. Id. at 436-37.

## IV. ANALYSIS

### A. Petitioner's Brady Claim is Without Merit

In the Petition for a Writ of Habeas Corpus, Petitioner alleges that Respondents violated his constitutional rights by failing to disclose exculpatory evidence at the time that Petitioner's direct appeal of his 2012 conviction was pending. (See Doc. Nos. 1, 18.)

As noted in the R&R, because the state court declined to make any findings as to the accuracy of Darnell Outlaw's ("Outlaw") statement, Magistrate Judge Craig M. Straw was authorized to hold an evidentiary hearing to consider the additional evidence, to which Petitioner does not object. (Id. at 17.) Further, the R&R acknowledged that a Brady claim could be recognized where exculpatory information was first discovered while a petitioner's direct appeal was pending because a prosecutor's Brady duties endure until a defendant's conviction becomes final. (Id. at 20-21.)

As to the substance of Petitioner's Brady claim, the R&R found that the first two elements to support such a claim—favorable information and suppression—were met in this case. (Id. at 22.) Nevertheless, the R&R found that the third element was not met because Outlaw's statement to the PPD was not material, and thus, no actionable Brady claim exists. (Id. at 24.) Because Petitioner's objections to the R&R are solely focused on the Magistrate Judge's materiality finding, the Court need only address whether the evidence was material to create a reasonable probability of a different result on Petitioner's motion for a new trial.

Here, the evidence of Outlaw's statement to the PPD is not material and, for this reason, no actionable Brady claim exists. Evidence is considered material if "there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" Wearry v. Cain, 577 U.S. 385, 392 (2016) (quoting Giglio, 405 U.S. at 154). To prevail on a Brady claim, a petitioner "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted," but instead "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." Id. (quoting Smith v. Cain, 565 U.S. 73, 75 (2010)). "Evidence can be material even if it 'goes to the credibility of the witness.'" Glossip v. Oklahoma, 604 U.S. 226, 248 (2025). Moreover, "the materiality of withheld evidence must be 'considered collectively, not item by item.'" Dennis v. Sec'y, Pa. Dep't of Corrs., 834 F.3d 263, 312 (3d Cir. 2016) (quoting Kyles v. Whitley, 514 U.S. 419, 436 (1995)).

The R&R found that Outlaw naming Wilson as the actual perpetrator to the PPD was not sufficient to undermine his first-degree murder conviction because the trial evidence was strong and Outlaw's statement would likely have minimal exculpatory value. (Doc. No. 54 at 28.) In response, Petitioner objects to the R&R's findings for two reasons.

First, Petitioner argues that had he received the Outlaw statement during the pendency of his direct appeal, there is a reasonable probability that he would have prevailed on a hypothetical after-discovered evidence claim in front of a reasonable judge. (Doc. No. 59 at 23.) Further, Petitioner claims that the strength of the evidence—a witness testifying that a person other than Petitioner committed the crime of conviction—is of such a great magnitude that it would clearly create reasonable doubt. (Id. at 25.) The Court disagrees.

As a preliminary matter, Petitioner and Respondents disagree as to the proper materiality standard for the disclosure of Brady evidence. Petitioner argues that materiality should be measured by asking whether a reasonable judge would have granted his post-sentence motion for a new trial, requiring the Court to determine whether the after-discovered evidence "would likely result in a different verdict if a new trial were granted." (Doc. No. 59 at 25.) Respondents counter that the materiality inquiry should be framed under Brady as whether there is "a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed." (Doc. No. 64 at 8) (quoting Turner v. United States, 582 U.S. 313, 324-25 (2017). Nevertheless, the Court need not decide the question, because under either standard, the suppressed evidence is not material.

Considering the strength of the prosecution's trial evidence, Outlaw's statement does not undermine confidence in the outcome of this case. Taken together, the trial evidence contains numerous corroborated witness identifications and evidence of motive and consciousness of guilt, providing sufficient support for the verdict. As noted by the R&R, "Colon gave a detailed description of Williams within hours of the shooting, and then identified him from a photo array four days later. Little's statement corroborated that identification by placing Williams at the scene. Lizzette further corroborated the identification by testifying that during the earlier

encounter, she saw Williams on Wilson's porch and heard Nazario announce his intention to confront Williams. Finally, the testimony from Wilson's mother, Elissa Barber, regarding the nature of Wilson and Williams' relationship, her matching description of Williams' hair, and Williams' conduct following the murder – which demonstrated consciousness of guilt – provided additional support for the verdict." (Doc. No. 54 at 29.)

Regardless of whether Outlaw's statement would have provided Petitioner with an alternative defense strategy, allowing him to undermine the credibility of the police investigation, the force of the statement would not contravene the aggregate impact of the trial evidence. In fact, the introduction of Outlaw's statement could have backfired because it placed Petitioner at the scene of the shooting. As such, Petitioner has fallen short of forging a path to materiality when weighing the cumulative effect of the suppressed statement against the substantial trial evidence.

Second, Petitioner takes issue with the R&R's characterization of Outlaw as lacking in credibility, contending that there are ample reasons for a jury to credit his testimony. (Doc. No. 59 at 32.) Because Outlaw spoke to the PPD even while expressing discomfort in doing so, and he had no apparent bias that would influence his testimony, it follows that a jury would find his testimony to be credible and consistent with prior statements made to the FBI. (Id.)

But even assuming Outlaw's testimony would be admissible in some form at trial, a jury's credit of his testimony is far from guaranteed. True, prior to making the statement to the PPD identifying Wilson as the shooter, Outlaw made a statement to the FBI reciting the same information. (Doc. No. 54 at 39.) However, when speaking to the FBI he said he was motivated to come forward due to Wilson's dangerousness and fear for his family's safety. (Id.) Nevertheless, at the evidentiary hearing conducted by Magistrate Judge Straw, "he characterized

his disclosure to the FBI as motivated largely by a desire to help Williams, whom he believed was innocent." (Id.) Besides offering shifting explanations for his identification of Wilson as the actual perpetrator, his testimony amounts to a "self-serving hearsay confession" from a close friend of Petitioner. (Id.)

Additionally, the evidence that the Commonwealth would have offered in response to Outlaw's testimony would reduce its probative value significantly. In determining the effect of new evidence, the Court must consider not only the potential exculpatory value of the testimony, but also how the Commonwealth would likely have challenged it. Williams v. Beard, 637 F.3d 195, 227 (3d Cir. 2011). Notably, at the time he made the statement, Outlaw was recently incarcerated in connection with a robbery that involved Wilson. (Doc. No. 54 at 40.) Consequently, as mentioned in the R&R, the Commonwealth "could have argued that Outlaw sought to gain leniency in his federal case by cooperating in the state murder prosecution…" (Id.) Accordingly, there are numerous avenues from which the Commonwealth could have undermined Outlaw's credibility, lessening the statement's probative impact.

Because Petitioner cannot demonstrate that Outlaw's statement to the PPD was material, he cannot successfully establish a Brady violation. Thus, Petitioner's claim fails on the merits.

## V. CONCLUSION

For the foregoing reasons, the Court will overrule Petitioner's Objections to Judge Straw's Report and Recommendation (Doc. No. 59), approve and adopt Magistrate Judge Straw's Report and Recommendation (Doc. No. 54), and deny the Petition for Writ of Habeas Corpus (Doc. No. 18.)